IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CLARA DANIELS, *et al.*

    *Plaintiffs*,

v.

THE CARTER-JONES LUMBER
COMPANY, *et al.*

    *Defendants*.

Civil Action No. ELH-17-982

## MEMORANDUM OPINION

In this tort litigation, Clara and Robert Daniels, plaintiffs, filed suit against The Carter-Jones Lumber Company, d/b/a Carter Lumber Company ("Carter Lumber"), and E3 Holdings, LLC, d/b/a EnerLux Windows and Doors ("EnerLux"), defendants. *See* ECF 26 ("Amended Complaint"). Plaintiffs allege that, due to the negligence of EnerLux and Carter Lumber, Ms. Daniels sustained serious injuries on April 11, 2014, when custom windows that she had been inspecting while on the delivery truck fell on her. *Id.*[1] In addition, plaintiffs assert a claim for loss of consortium. *Id.* And, as to Carter Lumber, plaintiffs allege a claim of negligent supervision. *Id.*

Both defendants have moved for summary judgment, supported by memoranda of law and exhibits. *See* ECF 50 (EnerLux's motion); ECF 50-1 (EnerLux's memorandum of law) (collectively, the "EnerLux Motion"); ECF 50-2 through ECF 50-7 (EnerLux's exhibits); ECF 51 (Carter Lumber's motion); ECF 51-1 (Carter Lumber's memorandum of law) (collectively,

---

[1] The case was initially assigned to Judge J. Frederick Motz, but was reassigned to me on October 24, 2017. *See* Docket. In the Amended Complaint (ECF 26), plaintiffs also sued J.B. Hunt Transport, Inc. ("J.B. Hunt"), the company that transported the windows. However, by Memorandum Opinion (ECF 37) and Order (ECF 38) of November 16, 2017, I granted J.B. Hunt's motion to dismiss (ECF 32).

the "Carter Lumber Motion"); ECF 51-2 and ECF 51-3 (Carter Lumber's exhibits). Plaintiffs oppose both motions and have submitted exhibits. *See* ECF 54 (opposition to the EnerLux Motion); ECF 54-1 (memorandum of law) (collectively, "Opposition - EnerLux"); ECF 54-2 through ECF 54-6 (exhibits); ECF 56 (opposition to the Carter Lumber Motion); ECF 56-1 (memorandum of law) (collectively, "Opposition - Carter Lumber"); ECF 56-2 through ECF 56-6 (exhibits). EnerLux has replied. *See* ECF 61. Carter Lumber has not filed a reply, and the time to do so has expired. *See* Local Rule 105.2.a.

No hearing is necessary to resolve the summary judgment motions. *See* Local Rule 105.6. For the reasons that follow, I shall deny both motions.

## I. Factual and Procedural Background[2]

Clara and Robert Daniels are citizens of West Virginia. ECF 26, ¶¶ 2, 4-5. EnerLux is a manufacturer of windows, with its principal place of business in Nebraska. *Id.* ¶ 6. Carter Lumber is a "building supply company," incorporated in Maryland, with its principal place of business in Ohio. *Id.* ¶ 10. Jurisdiction is founded on diversity of citizenship. *See* 28 U.S.C. § 1332.

At the relevant time, plaintiffs were building a retirement home in Falling Waters, West Virginia. ECF 54-4 (Deposition of Mr. Daniels) at 3, p. 6.[3] In 2014, in connection with the construction of the home, plaintiffs purchased more than eighty custom windows and doors from EnerLux, at a cost in excess of $50,000. *Id.*; ECF 54-3 (Deposition of Ms. Daniels) at 12, p. 42; *id.* at 23, p. 86; ECF 26, ¶ 16.

---

[2] I shall limit the factual and procedural background to include only matters of relevance to this Memorandum Opinion.

[3] With respect to the deposition transcripts submitted by plaintiffs, I shall cite to the electronic pagination as it appears on CM/ECF. Because each electronic page contains multiple deposition pages, I shall also refer to the specific deposition page on the document.

Plaintiffs' builder, Thomas Sandretzky, arranged for EnerLux to deliver the windows and doors to the premises of Carter Lumber in Williamsport, Maryland. ECF 54-4 at 3, pp. 6-7; ECF 54-3 at 7, p. 23; ECF 26, ¶¶ 17, 18.

Paul Vonderfecht founded EnerLux in 2008. *See* ECF 54-2 (Deposition of Paul Vonderfecht) at 2, p. 5. Prior to forming EnerLux, Vonderfecht worked as a contractor engaged in the installation of windows and doors. *Id.*

The windows were transported to Carter Lumber by J.B. Hunt Transport, Inc., on behalf of EnerLux. Vonderfecht supervised the packaging, loading, and securing of the doors and the windows on the truck for delivery to Carter Lumber. ECF 54-2 at 10, p. 37; *id.* at 5, p. 16. Although Vonderfecht acknowledged that he did not recall packaging the specific windows shipped to Carter Lumber, he stated that "[a]ll the jobs are the same" and that he is "always on the truck helping load them up." *Id.* at 5, p. 16. Further, Vonderfecht stated that he is "the one that does the strapping and final inspection. We package all the jobs the same." *Id.* According to Vonderfecht, the windows were pushed up against the walls of the truck so that they stood vertically. *Id.*, p. 17. Straps with ratchets were used to fasten the windows in place. *Id.* He also stated that the straps were tightened around the windows, and the ratchets were "closed all the way." *Id.*

On April 11, 2014, plaintiffs learned that the windows and doors "were being delivered" to Carter Lumber. ECF 26, ¶ 18; *see also* ECF 54-3 at 7, p. 23; ECF 54-4 at 3, p. 6. On that date, plaintiffs traveled to Carter Lumber with Sandretzky and several of Sandretzky's employees. ECF 54-3 at 7, p. 23. When plaintiffs arrived, the truck containing the windows and doors was parked, and the door to the cargo hold was open, thus allowing plaintiffs to see inside. *Id.* at 8, p. 26. At her deposition, Ms. Daniels stated, *id.* at 8, pp. 26-27: "It looked like

something was wrong. The windows . . . were filtered toward the center—away from the sides of the truck, so the bottoms of the windows were all touching and the tops of the windows were fanned out against the straps[.]" Ms. Daniels added, *id.* at 8, p. 27: "It looked like something was amiss in the way it was loaded."

Plaintiffs stood outside the truck, observing as Carter Lumber employees unloaded doors and several of the smallest windows. ECF 54-3 at 12, pp. 44-45. No representative of EnerLux was present. Plaintiffs inspected one of the windows after it was unloaded, and were concerned that it had been damaged. *Id.* at 12, p. 45. Additionally, Ms. Daniels stated, ECF 54-3 at 12-13, pp. 45-46: "[T]he top corners [of the windows] were padded with just styrofoam, but the styrofoam was about, altogether, about six inches wide, but the heavier-density foam that was at the bottom [of the windows] was maybe four inches wide."

Ms. Daniels has surmised that the size difference between the styrofoam used to package the tops and bottoms of the windows caused the windows to lean inward, giving them the appearance that they were "fanned out" inside the truck. *Id.* at 13, p. 46. Further, she observed that the straps holding the windows against the side of the truck "were slack," allowing the windows to lean inward. *Id.*, p. 47. Ms. Daniels recalled that the windows needed to be "physically pushed back and held up to be unstrapped, and then to be unloaded one by one because, otherwise, they would have crashed to the floor." *Id.* at 16, p. 58.

Ms. Daniels recounted that "someone from Carter [Lumber] had agreed that it would be a good idea to get a photo, if something was damaged." *Id.* at 15, p. 54. So, she got into the cargo hold of the truck to observe the windows as they were being unloaded and to take pictures of any window that appeared to have been damaged. *Id.* at 16, p. 60. However, Ms. Daniels did not help to unload the windows. *Id.*

At her deposition, Ms. Daniels testified, ECF 54-3 at 17, pp. 62-63:

When they got to the very last set of windows, and these were the largest for the house, these windows were standing on their own; when they were unstrapped, they were still upright. . . . . The windows were large enough that it took two men for each window, so the unloading was taking a little longer . . . . So they took two or three out of that last set, and the windows were upright, the remaining windows were upright, the remaining three or four, and I was standing near those windows and I recall Tom Sandretzky's employee Bobby, and a Carter employee, walking off the truck with the window right before that, and, at that point, for the first time as I recall, I was alone in the truck for a few seconds and I was standing a foot or so away from the opposite wall of the truck, opposite, and that's when the accident happened.

I sensed something, because I put my hands up, and the first window fell against my hands; I'm not sure why I sensed it, and I kind of thought that was pretty heavy, and I braced, and then, within a second, the second window fell against it, and I know that—and then the other two toppled—I mean, all of that, from the time I put my hands up to when all the windows were on top of me was probably less than two seconds. But I put my hands up to brace, and the first window fell and the second, and then, when the other two came against it, that is when the windows pushed me back against the other side of the truck and fell on me.

The following testimony of Ms. Daniels is also relevant, ECF 51-2 at 6:

Q: And you knew, from the moment that you first saw how the windows were stacked and strapped in, that there was a problem.

A: Yes.

Q: And you knew that the problem could result in the windows falling and either damaging the windows or damaging anyone else or injuring somebody that the windows fall on; correct?

A: That was our initial concern.

Q: "Initial" meaning before a single window or door came out of the truck.

A: There was concern from the very beginning.

At his deposition, Mr. Daniels stated, ECF 54-4 at 8, p. 26: "[A]n agreement was struck between all of the workers as to how they were going to proceed to unstrap and make sure that they did not have the windows get damaged and did not have anybody get hurt." He explained,

-5-

*id.*, p. 27: "There were enough individuals present such that the workers would go in and hold up or push the windows back against the wall, get them as stable as possible, take the strap off, hold the windows in place, and remove the first window [one] at a time, as they were pulling them off in an orderly fashion."

At his deposition, Mr. Daniels stated that he is trained as a chemical engineer and that he has worked, *inter alia*, in "warehouse management." ECF 54-4 at 4, p. 13. In that role, Mr. Daniels was responsible, *inter alia*, for "quality control of . . . how things are shipped and packaged in the back of trucks, tankers, airlines[.]" *Id.* at 5, p. 14. Mr. Daniels testified that there was "great reason to be concerned" about damage to the windows, because the packaging "looked suspiciously incorrect . . . ." ECF 54-4 at 3, p. 8. He observed that the "windows had all remained semi-upright but were leaning against their restraining straps," some of which "had broken but not enough to allow the windows to completely fall over." *Id.* at 3, p. 9.[4]

---

[4] At his deposition, Mr. Daniels provided three reasons as to why the windows were unstable inside the truck, ECF 54-4 at 9, pp. 32-33:

> Reason number one, there was no dunnage in the truck, D-U-N-N-A-G-E, which is to fill up the void spaces and to keep the load from shifting; two, the straps were not strong enough to retain the windows against the side of the truck so that they would not fall inward; and item three, the packaging on the windows created an additional opportunity for them to shift toward the middle of the truck because the packaging at the bottom of the window was narrower than the packaging at the top, causing a natural fan, from the very beginning of the shipment.

EnerLux argues that this portion of Mr. Daniels's testimony constitutes expert opinion. ECF 50-1 at 3. In a motion in limine (ECF 47), and in the Motion (ECF 50; ECF 50-1 at 3), EnerLux has argued that such opinion testimony is improper because plaintiffs did not designate Mr. Daniels as an expert witness. By Memorandum (ECF 62) and Order (ECF 63) of April 17, 2018, I denied EnerLux's motion in limine as premature, and without prejudice to the right of EnerLux to renew the motion before trial.

Of import here, in denying the summary judgment motions, I have not relied on the so called expert testimony of Mr. Daniels with respect to alleged defects and flaws in the packaging

Mr. Daniels also indicated that he recognized that the windows might fall. The following testimony is pertinent, ECF 51-3 at 2:

> Q: Was there concern that the windows would fall?
>
> A: Yes.
>
> Q: And was that concern communicated to your wife?
>
> A: Yes.
>
> Q: And was that communicated before she was on the truck?
>
> A: Yes.
>
> Q: Right from the beginning, you were concerned how the windows were strapped in; correct?
>
> A: Yes.
>
> Q: You were concerned about whether they could fall; correct?
>
> A: Yes.
>
> Q: And you communicated that to your wife before she ever stepped into the truck; correct?
>
> A: Yes.

Jason Mullens, a Carter Lumber employee, testified at his deposition (ECF 54-5) that he helped to unload the windows and doors from the truck. *Id.* at 3-5, pp. 8-14. Mullens stated that Ms. Daniels was not in the way, or otherwise a nuisance, as the windows and doors were unloaded. *Id.* at 5, p. 17. Additionally, Mullens indicated that no Carter Lumber employee asked Ms. Daniels to remove herself from the truck. *Id.* Mullens saw the windows fall onto Ms. Daniels, such that they pinned her against the side of the truck. *Id.* at 6, pp. 18-20. Thereafter, 911 was called, and an ambulance arrived. *Id.* at 6, pp. 20-21.

---

of the windows. Thus, the question remains as to whether his testimony constitutes improper expert opinion testimony, or whether it is admissible as lay opinion testimony.

Additional facts are included in the Discussion.

## II. Standard of Review

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the

[nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. As indicated, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

### III. Discussion

#### A.

A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules. *Colgan Air, Inc. v. Raytheon Aircraft Co.,* 507 F.3d 270, 275 (4th Cir. 2007). Regarding tort claims, Maryland applies the law of the state where the alleged harm occurred ("*lex loci delicti*"). *See, e.g., Proctor v. Wash. Metropolitan Area Transit Auth.,* 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010); *Erie Ins. Exch. v. Heffernan,* 399 Md. 598, 625, 925 A.2d 636, 651 (2007); *Phillip Morris, Inc. v. Angeletti,* 358 Md. 689, 744, 752 A.2d 200, 230 (2000). Because the alleged events took place in Maryland, the substantive tort law of Maryland governs plaintiffs' claims of negligence. *See Hauch v. Connor,* 295 Md. 120, 123–24, 453 A.2d 1207, 1209 (1983).

The Maryland Court of Appeals recounted the elements of a negligence claim in *Hamilton v. Kirson*, 439 Md. 501, 523-24, 96 A. 3d 714, 727-728 (2014). It said, *id.* (internal quotations, alteration, and citation omitted):

> To state a claim for negligence a party must show 1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of the duty.

*See 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.,* 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) ("[T]o assert a claim in negligence, the plaintiff must prove: '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'") (citation omitted); *Schultz v. Bank of Am., N.A.,* 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is

a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques v. First Nat'l Bank of Md.,* 307 Md. 527, 531, 515 A.2d 756, 758 (1986)) (alterations in *Schultz*); *Lloyd v. Gen'l Motors Corp.,* 397 Md. 108, 131-32, 916 A.2d 257, 270-71 (2007).

A defendant's negligence is the proximate cause of a plaintiff's injury when the negligence is "1) a cause in fact, and 2) a legally cognizable cause." *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 429 Md. 387, 429, 56 A.3d 170, 195 (2012) (quotations and citation omitted); *see Pittway Corp. v. Collins*, 409 Md. 218, 243-46, 973 A.2d 771, 786-788 (2009). Causation-in fact pertains to the "who or what caused an action." *Pittway*, 409 Md. at 244, 973 A.2d at 786-87.

In Maryland, when an injury arises from two or more independent negligent acts, the court must apply the substantial factor test. *Kiriakos v. Phillips*, 448 Md. 440, 139 A.3d 1006, 1021 (2016). The question is whether it is "'more likely than not' that the defendant's conduct was a substantial factor in producing the [plaintiff's] injuries." *Id.* (citation omitted) (alteration in *Kiriakos*). The Maryland Court of Appeals looks to the Restatement (Second) of Torts for this purpose. *Id.*

As to the issue of legally cognizable cause, the court must "consider whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Pittway*, 409 Md. at 245, 973 A.2d at 787. The Court of Appeals recently explained that, ordinarily, but not necessarily, the question is "'whether the injuries were a foreseeable result of the negligent conduct.'" *Kiriakos*, 448 Md. at 466, 139 A.3d at 1021 (citation omitted).

**B.**

EnerLux has moved for summary judgment as to plaintiffs' claim of negligence. *See* ECF 50. EnerLux contends that, because plaintiffs did not designate an expert witness, they have failed to "establish the relevant standard of care owed by EnerLux." ECF 50, ¶ 2; *see also* ECF 50-1 at 9; ECF 50-2 (Plaintiffs' Rule 26(a)(2) Disclosures); ECF 50-7 (Plaintiffs' Supplemental Rule 26(a)(2) Disclosures). Further, EnerLux maintains that plaintiffs failed to "establish any breach of the relevant standard of care." ECF 50, ¶ 2; *see also* ECF 50-1 at 10. Additionally, EnerLux avers that "any negligence on the part of EnerLux . . . was not the proximate cause of Plaintiffs' injuries." ECF 50, ¶ 2; *see also* ECF 50-1 at 10-12. To that point, EnerLux argues that it was "entirely unforeseeable" that "Ms. Daniels would have been on the truck at all." ECF 50-1 at 11.

Plaintiffs argue that they "proffered sufficient evidence of the standard of care through the deposition testimony of Paul Vonderfecht—the Enerlux employee who supervised the loading of the windows." ECF 54-1 at 12. Additionally, they contend that no expert testimony is necessary, because "securing cargo is a common life event experienced by the average juror." *Id.* at 13. They insist that "[t]he average juror would have no problem understanding the materials and processes, e.g. straps, manual labor and padding, used by Mr. Vonderfecht," in order to determine whether "Enerlux used due care to deliver the windows to Plaintiffs." *Id.* Further, plaintiffs assert that EnerLux's negligence was the proximate cause of Ms. Daniels's injuries. *Id.* at 15-18. And, they dispute EnerLux's argument as to foreseeability.

To be sure, plaintiffs bear the burden of proof at trial. However, at the summary judgment stage, the facts are construed in the light most favorable to plaintiffs as the non-moving parties. Certainly, EnerLux could have submitted the opinion of a designated expert to support

its claims that plaintiffs have not established the duty of care owed by EnerLux or a breach of that duty. But, it has not done so.

Under Maryland law, "[i]f a jury can use its 'common knowledge or experience' to recognize a breach of a duty, then expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant." *Jones v. State of Maryland*, 425 Md. 1, 27, 38 A.3d 333, 348 (2012) (citation omitted); *see Carter v. Shoppers Food Warehouse MD Corp.*, 126 Md. App. 147, 158, 727 A.2d 958, 964 (1999) ("Expert testimony is not necessary when it relates to 'matters of which the jurors would be aware by virtue of common knowledge.'") (citation omitted); *see also Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship,* 109 Md. App. 217, 257, 674 A.2d 106, 125-26 (1996) ("Expert testimony is not required . . . on matters of which the jurors would be aware by virtue of common knowledge."), *aff'd*, 346 Md. 122, 695 A.2d 153 (1997).

Indeed, "'[t]he general rule is well established that expert testimony is only required when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman.'" *Hartford Accident and Indem. Co.,* 109 Md. App. at 287, 674 A.2d at 125 (quoting *Virgil v. "Kash 'N' Karry" Service Corp.,* 61 Md. App. 23, 31, 484 A.2d 652, 656 (1984), *cert. denied*, 302 Md. 681, 490 A.2d 719 (1985). Ordinarily, in a case alleging negligence by a professional, expert testimony is required to establish the standard of care owed by the professional. *Jones*, 425 Md. at 26, 38 A.3d at 347. This is so to explain professional or specialized standards. *Id.* However, the Maryland Court of Appeals has said that experts are not needed "when 'the alleged negligence is so obvious that the trier of fact could easily recognize that such actions would violate the applicable standard of care.'" *Id.*, 38 A.3d at 348 (citation omitted); *see Carter*, 126 Md. App. at 159, 727 A.2d at 964 ("The trial court did

not err in determining that [an expert witness's] testimony would not assist the jury's understanding of a fact in issue because a juror's common knowledge sufficiently provides him or her the ability to comprehend a slip and fall on a carpet.").

Similarly, under federal law, a properly qualified expert witness may testify regarding technical, scientific, or other specialized knowledge in a given field if the testimony would assist the trier of fact in understanding the evidence or to determine a fact in issue. *See* Fed. R. Evid. 702. However, expert testimony is inadmissible if it is directed towards matters "within the common knowledge of jurors." *Persinger v. Norfolk & Western Ry. Co.*, 920 F.2d 1185, 1188 (4th Cir. 1990). In *Scinto v. Stansberry*, 841 F.3d 219, 230 (4th Cir. 2016), the Court said: "When laypersons are just 'as capable of comprehending the primary facts and of drawing correct conclusions from them' as are experts, expert testimony may properly be excluded." (Citation omitted); *see Wells Fargo, N.A. v. Chesapeake Financial Services, Inc.*, MJG-08-2439, 2013 WL 3805064, at *24 (D. Md. July 19, 2013) ("[I]f a jury can use its common knowledge or experience to recognize a breach of a duty, then expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant.") (internal quotation marks and citation omitted).

In my view, expert testimony is not necessarily foreclosed here, but neither is it essential "to calibrate the exact standard of care." *See Jones*, 425 Md. at 27, 38 A.3d at 348. The standard of care relates to windows that obviously had to be secured properly to avoid a hazard. The windows were secured with straps, ratchets, and styrofoam. To determine whether the windows were adequately secured is not necessarily an issue "'beyond the ken of the average layman.'" *See Hartford Accident and Indem. Co.,* 109 Md. App. at 287, 674 A.2d at 125 (citation omitted).

According to Ms. Daniels, the manner in which "the bottoms of the windows were all touching and the tops of the windows were fanned out against the straps" made it appear that

"something was wrong" in the way the windows had been secured inside the truck. ECF 54-3 at 8, pp. 26-27. As to the styrofoam pads on the corners of the windows, plaintiffs indicated that the styrofoam used on the bottoms of the windows was narrower than the styrofoam used on the tops of the windows. ECF 54-4 at 6, p. 18; ECF 54-4 at 9, p. 33; ECF 54-3 at 12, p. 45.

Ms. Daniels also stated that the straps securing the windows "were slack." *Id.* at 13, p. 47. And, she indicated that if the windows had not been "physically pushed back and held up" they "would have crashed to the floor" when the straps were removed. *Id.* at 16, p. 58. Moreover, she claimed that the windows were leaning inward, like a fan. ECF 54-3 at 8, pp. 26-27; ECF 54-4 at 3, p. 9. According to Ms. Daniels, the windows that fell on her were not secured. ECF 54-3 at 17, pp. 62-63. She claimed that, before the unsecured windows fell on her, multiple people had been walking around inside the truck. *Id.*; *see also* ECF 54-5 at 5-6, pp. 17-19.

Vonderfecht stated that, to assess the efficacy of EnerLux's packaging methods, he "tested the hell out of it" by driving "over railroad tracks, hop[ping] street curbs, going 60 [miles per hour and] slamming on the brakes, smack into the back of the loading dock bumper, trying to simulate stuff." *Id.* at 9, p. 30; *see id.* at 11, p. 38. According to Vonderfecht, these tests demonstrated that there were "zero issues" with EnerLux's packing methods. *Id.* at 9, p. 30. And, he stated that EnerLux has "had zero issues since" Ms. Daniels was injured. *Id.*

But, of relevance here, Vonderfecht acknowledged that, "[w]hen windows are unstrapped, they can be dangerous and heavy. You don't ever assume that they're not going to fall." ECF 54-2 at 12, p. 45. He also explained that they can be "damaged" due to their "size and weight." *Id.* He added, *id.*: "So you always have to take a lot of precautions." Further, he stated that, during the unloading process, unstrapped windows should be secured in place at all

times to prevent them from falling. *Id.* at 13, p.46. And, he said that unsecured windows may fall due to "people walking on the truck" or "the angle of the land . . . ." *Id.* at 10, p. 34; *see also id*. at 9, pp. 31-32.

At Vonderfecht's deposition he indicated that he had not communicated with the truck driver or any Carter Lumber employee about the requisite safety measures when unloading windows from the truck. *See* ECF 54-2 at 11, p. 40. Apparently, EnerLux did not warn of the risks involved in entry onto the truck. *Id.* at 11, pp. 40, 53-54, 58. According to Vonderfecht, however, it was the standard practice of EnerLux to "push all the windows up against the wall so you don't have air pockets between them"; to make sure "they're all vertical against the wall"; to "pull the tension through" the straps that are holding the windows in place; and to make sure the ratchets on the straps are "closed all the way." ECF 54-2 at 5, p. 17. Further, Vonderfecht claimed that EnerLux's method "is the industry norm" (*id.* at 9, p. 30), and that EnerLux used "the same packaging methods" as other "window manufacturers." *Id.* at 10, p. 36.[5]

Vonderfecht acknowledged that EnerLux "stock[ed] two different corner pads" with "only a .05 inch difference" between the two types of corner pads. ECF 54-2 at 7, p. 24. And, he did not "remember [EnerLux] ever using different corner pads on any shipments." *Id.* Yet, Mr. Daniels claimed that, after the accident Vonderfecht told him that EnerLux "had used . . . a larger foam enclosure around the top part of the [window] frame, and a narrower enclosure around the bottom of the frame, and [Vonderfecht] specifically stated that they had changed that so that the windows would not have a tendency to work themselves against the straps as they were shipped to their customers[.]" ECF 54-4 at 6, p. 18.

---

[5] Vonderfecht was not named as a defense expert. It is not clear whether, at trial, he would be permitted to testify to "the industry norm" or common packaging methods of other manufacturers. But, at this juncture, plaintiffs have not challenged his testimony. To the contrary, they rely on it.

EnerLux claims that it was not foreseeable that Ms. Daniels would enter the truck to inspect the windows. But, a jury could conclude that EnerLux was aware that it was necessary for a person or persons to enter the truck to remove the windows and doors, and that injury might befall a person on the truck if the product was not properly packaged and restrained. In this light, it is of no moment that EnerLux did not anticipate the entry of a particular person, such as Ms. Daniels.

In my view, there is a genuine dispute of material fact as to the claim of negligence. The matter is one for a jury to resolve.

## C.

Both EnerLux and Carter Lumber assert that, because Ms. Daniels entered the truck of her own accord, she assumed the risk that she might be injured. *See* ECF 50-1 at 12-14; *see also* ECF 51-1 at 4. Accordingly, EnerLux and Carter Lumber argue that they are entitled to summary judgment on this basis. ECF 50-1 at 12-14; ECF 51-1 at 4.

In Maryland, assumption of the risk is an affirmative defense that, if proved by the defense, completely bars a plaintiff's recovery. *Crews v. Hollenbach,* 358 Md. 627, 640, 751 A.2d 481, 488 (2000). The doctrine of assumption of the risk "is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk." *Id.*; *see ADM P'ship v. Martin*, 348 Md. 84, 90-91, 702 A.2d 730, 734 (1997); *Marrick Homes, LLC v. Rutowski*, 232 Md. App. 689, 716, 161 A.3d 53, 69 (2017).

"'[I]n order to establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger.'" *S & S Oil, Inc. v. Jackson*, 428 Md. 621, 643, 53

A.3d 1125, 1138 (2012) (quoting *ADM P'ship*, 348 Md. at 90-91, 702 A.2d at 734). As the Maryland Court of Appeals said in *Poole v. Coakley & Williams Constr., Inc.*, 423 Md. 91, 112, 31 A.3d 212, 224 (2011), "'assumption of risk is a matter of knowledge of the danger and voluntary acquiescence in it.'" (Citation omitted).

Assumption of the risk will apply only if "'the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff.'" *Schroyer v. McNeal*, 323 Md. 275, 283, 592 A.2d 1119, 1123 (1991) (quoting *Kasten Constr. Co. v. Evans*, 260 Md. 536, 544, 273 A.2d 90, 94 (1971)) (emphasis in *Kasten*). An objective standard is used to determine whether the plaintiff appreciated and understood the risk and whether the action was voluntary. *Poole*, 423 Md. at 111, 31 A.3d at 224; *Morgan State Univ. v. Walker*, 397 Md. 509, 515, 919 A.2d 21, 25 (2007); *ADM P'ship*, 348 Md. at 91, 702 A.2d at 734. However, "'a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him'" or her. *ADM P'ship*, 348 Md. at 92, 702 A.2d at 734 (citation omitted).

Assumption of the risk does not require a finding that the plaintiff was negligent. *Schroyer*, 323 Md. at 282-83, 592 A.2d at 1123. The fact that the plaintiff was aware of the risk, and voluntarily undertook the risk, is sufficient to invoke the defense. *Id.* at 283, 592 A.2d at 1123. And, when a plaintiff assumes a risk, the plaintiff's voluntary action in showing a "willingness to take a chance" supersedes any duty the defendant owed the plaintiff to act reasonably for the plaintiff's safety. *Id.* at 282, 592 A.2d at 1123; *see Prudential Secs. v. e-Net, Inc.*, 140 Md. App. 194, 226-27, 780 A.2d 359, 377-78 (2001).

Of import here, it is ordinarily for the jury to determine whether a plaintiff knew of the danger, appreciated the risk, and acted voluntarily. PROSSER & KEETON § 68 at 487; *see also*

*Crews*, 358 Md. at 644, 751 A.2d at 490; *Poole*, 423 Md. at 109, 31 A.3d at 223; *Miller v. Michalek*, 13 Md. App. 16, 24, 281 A.2d 117, 121 (1971). "On the other hand, when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue [concerning knowledge, appreciation of the danger and voluntariness] is for the court." *Schroyer*, 323 Md. at 283-84, 592 A.2d at 1123 (citations omitted).

As indicated, before Ms. Daniels entered the truck, she saw that the windows inside the truck were leaning inwards, and that the straps holding the windows upright were not tightly drawn. ECF 54-3 at 12-13, pp. 45-47. Mr. Daniels stated that he was concerned the windows could fall. ECF 51-3 at 2. And, he indicated that he communicated his concern to Ms. Daniels before she entered the cargo hold of the truck. *Id.* Additionally, when asked whether she "knew that the problem [with the windows] could result in the windows falling and either damaging the windows or damaging anyone else or injuring somebody that the windows fall on," Ms. Daniels stated: "That was our initial concern." ECF 51-2 at 6.

However, it is not clear, as a matter of law or fact, that Ms. Daniels appreciated the risk, given that employees of Carter Lumber and Sandretzky were in the truck with her, lifting and stabilizing the windows to prevent them from falling. ECF 54-3 at 12, p. 44; *id.* at 16, p. 58. Moreover, Ms. Daniels stated that a Carter Lumber employee agreed that she should enter the truck to take photographs of the potentially damaged windows. *Id.* at 15, p. 54; *see also* ECF 54-6 (Deposition of Ralph Dennis, Carter Lumber's Corporate Designee) at 24, p. 92. There is no indication that EnerLux placed any warning signs in the cargo hold, alerting to the danger at issue. ECF 54-2 at 11, p. 40; ECF 50-1 at 10-12. Nor did Carter Lumber alert Ms. Daniels to any risk, or ask Ms. Daniels to leave the truck because of any risk to her. *See* ECF 54-5 at 5, p. 17.

In the context of this case, it is the task of the jury, not the Court, to determine whether Ms. Daniels assumed the risk of injury.

## IV. Conclusion

For the foregoing reasons, I shall deny the summary judgment motions (ECF 50; ECF 51). An Order follows.

Date: May 23, 2018

/s/
Ellen Lipton Hollander
United States District Judge